UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| QUAD/GRAPHICS, INC., <br><br>          Plaintiff, <br><br> v. <br><br> TAG WORLDWIDE (USA) INC., <br><br>          Defendant. | Civil Action No.: <br><br><br> **COMPLAINT** |

Plaintiff, Quad/Graphics, Inc., by its attorneys, White and Williams LLP, as and for a cause of action against the Defendant, alleges the following:

## THE PARTIES

1. The plaintiff, Quad/Graphics, Inc., is a Wisconsin corporation ("Quad"), with a principal place of business located at N61W23044 Harrys Way, Sussex, Wisconsin 53089.

2. The defendant, Tag Worldwide (USA) Inc., is a Delaware corporation ("Tag"), with a principal place of business located at 530 Seventh Ave., 23rd Floor, New York, New York 10018.

## JURISDICTION AND VENUE

3. The amount in controversy in this action, exclusive of interest and costs, exceeds $75,000.

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1), because this action is between citizens of different states: Quad's principal place of business and state of incorporation is Wisconsin and Tag's principal place of business is New York and state of incorporation is Delaware.

5. This Court has personal jurisdiction over Tag because Tag irrevocably and unconditionally submitted to this Court's jurisdiction pursuant to the contract this dispute arises from, and Tag transacts business within the state of New York.

6. This Court may exercise personal jurisdiction over Tag and such exercise is consistent with the Due Process Clause of the U.S. Constitution.

7. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because the parties "irrevocably and unconditionally submit[ted] . . . to the exclusive jurisdiction and venue (and waive any claim of forum non-conveniens) of" this Court. *See* General T&Cs (defined below), ¶ 24.6.

## BACKGROUND FACTS

### *The Barclays CIT Mailing Project.*

8. Quad is a full-service marketing experience company offering direct marketing, commercial and direct mail printing, and print management services, including printing and folding letters, inserting such letters and promotional materials into envelopes, mailing those materials to individuals, and managing third parties to do the same.

9. Tag is a company that offers business process outsourcing to large companies whose services include, among other things, managing direct mail printing, mail processing, bulk mailing, and page layout.

10. Upon information and belief, among other services, Barclays Bank PLC ("Barclays") provides retail banking services for retailers' store credit cards, such as Gap, Inc.'s ("Gap") store credit cards.

11. Upon information and belief, Barclays contracted with Tag to manage and oversee a large print-mail project relating to the Gap's change in retail banking service provider to Barclays. This print-mail project is referred to as the "Barclays CIT Mailing."

12. The Barclays CIT Mailing required:

(a) printing multiple components, including letters to the Gap's cardholders ("Letters"), additional materials, including privacy statements, reward rules, reward brochures, and two other printed materials, which were required to be included with the Letters (collectively, the "Preprint Materials" and individually, an "Insert"), and outer envelopes ("Outer Envelopes") to carry the Letters and Preprint Materials,

(b) folding the Letters and inserting Preprint Materials into the Outer Envelopes (the completed Letters, Preprint Materials, and Outer Envelopes are referred to as the "Final Materials"), and

(c) mailing the Final Materials to the Gap's customers (the "Mailing").

13. Upon information and belief, Tag was responsible for managing the Barclays CIT Mailing.

14. Tag contracted with Quad as a print shop and lettershop to produce and fold the Letters and to provide lettershop services for nearly 12 million pieces.

15. Upon information and belief, Tag contracted with print shops other than Quad ("Third Party Print Shops") to perform other discrete services related to the Barclays CIT Mailing.

16. Upon information and belief, the Third Party Print Shops were responsible for printing and providing the Preprint Materials required for the Barclays CIT Mailing.

17. Each component, *i.e.*, Outer Envelope, Letter, and Insert, had various versions. The versions differed substantively, such that no component could be substituted. In part, this is because there are four retailers under the Gap brand: Gap, Banana Republic, Old Navy, and Athleta. In other words, the Letters, Preprint Materials, and Outer Envelopes were unique to each of the brands.

18.     Beyond the brand differences, there were as many as three different Outer Envelopes, four versions of an Insert called "CMA," two different versions of an Insert referred to as "the privacy statement," four different versions of an Insert called "GTB," two different versions of an Insert referred to as "the reward rules," and two different versions of an Insert referred to as "the reward brochures."  The Insert versions varied because of the language the text was printed in (English or Spanish) or because the content was unique to the customer (such differences include reward levels and perks related to those reward levels).

19.     Put into context, for Gap, there was an aggregate total of more than 7.5 million Outer Envelopes and Preprint Materials; for Banana Republic, there was an aggregate total of more than 18 million Outer Envelopes and Preprint Materials; for Old Navy, there was an aggregate total of more than 33.5 million Outer Envelopes and Preprint Materials; and for Athleta, there was an aggregate total of more than 2.6 million Outer Envelopes and Preprint Materials.

### *The Contract Terms.*

20.     Quad and Tag entered into (a) the Terms and Conditions for the Purchase of Printed Goods and Related Services, effective September 1, 2021 (the "T&Cs"), (b) the General Terms and Conditions (the "General T&Cs"), (c) the October 7, 2021 RFP (the "RFP"), and (d) the Proposal, dated October 29, 2021 (the "Proposal" and collectively with the T&Cs, the General T&Cs, and RFP, the "Contract"), all with respect to the Barclays CIT Mailing.  A true and correct copy of the Contract is attached as **Exhibit A**.

21.     The T&Cs stated that an "RFP" would specify "the price, time of performance, Service Levels and any other terms that [Tag] requests [Quad] to provide as part of such RFP in connection with manufacturing and delivering the Printed Goods and related Printing Services that are requested in such RFP."  *See* T&Cs, Sec. I.

22. The T&Cs provided that the RFP's terms would be incorporated into the T&Cs and, together with the General T&Cs, would constitute a "Purchase Order."

23. The General T&Cs defined a "Purchase Order" as the RFP and an accepted Proposal. *See* General T&Cs, Sec. 2.1.

24. The General T&Cs provided that the "Agreement and all Purchase Orders constitute the entire agreement between [Quad] and [Tag] with respect to the subject matter contained herein . . . ." *See* General T&Cs, Sec. 24.7.

25. Quad submitted the Proposal to Tag on October 29, 2021; Tag accepted the Proposal.

26. The Proposal specified that 11.7 million Outer Envelopes and Preprint Materials would be "Customer supplied . . . [and] delivered to Quad". *See* Proposal.

27. The Proposal allocated Letter production and folding and lettershop services to Quad ("Quad's Services"). *See* Proposal.

28. Specifically, Tag contracted with Quad to provide the following services related to Letter production and folding: (a) roll-to-roll pre-printing, *i.e.*, print the letterhead or stationery on the paper provided by Tag; (b) data processing and programming, which included downloading and formatting nearly 12 million data records to a file transfer protocol site and converting the files into useable files for the print machine; (c) personalizing the text of the Letter to each recipient, *i.e.*, address each Letter; and (d) printing, collating, folding, and trimming the Letters. *See* RFP and Proposal.

29. With respect to the lettershop services, Tag contracted with Quad to hire and manage individual lettershops to (a) receive the Letters, the Print Materials, and Outer Envelopes, (b) create the Final Materials by inserting the Letters and the Preprint Materials into the Outer Envelopes, and (c) mail the Final Materials to the recipients. *See* RFP and Proposal.

30. Accordingly, Quad sub-contracted with four lettershops ("Lettershops") to handle the volume and scale of the Barclays CIT Mailing Project.

31. The proposed cost for Quad's Services was $1,737,720.

32. As part of the accepted Purchase Order, Tag and Quad agreed to the following timeline as set forth in the RFP:

| Milestone | Deadline |
|---|---|
| Paper Order Date | October 7, 2021 |
| Final Art Files Due | January 5, 2022 |
| Preprint Proof | January 8, 2022 |
| Preprint Proof Approval and Print Counts Provided | January 15, 2022 |
| DP Instructions Due | January 28, 2022 |
| Test Date Files Due | January 28, 2022 |
| Test Data SOF's (PDFs) | February 11, 2022 |
| Test Data SOF's (paper): | February 11, 2022 |
| Approval/revisions to Test Data SOFs | February 18, 2022 |
| **Preprint Materials due at Lettershop** | **February 18, 2022** |
| Live Imaging SOF's (PDFs) | March 7, 2022 |
| Live Imaging SOF's (paper) | March 7, 2022 |
| Imaging SOF approval | March 17, 2022 |
| Laser & Lettershop | March 17, 2022 |
| Mail Drop Start (60 day opt out) | April 1, 2022 |
| Mail Drop End (47 day opt out) | April 15, 2022 |

*See* RFP (**emphasis added**).

### *What the Contract Did Not Include.*

33. The Contract did not require Quad to comprehensively manage the entire Barclays CIT Mailing. In other words, Quad was not contracted to manage or coordinate with the Third Party Print Shops for the Preprint Materials and Outer Envelopes. *See generally*, RFP and Proposal.

34. The Contract did not require Quad to print or supply the Preprint Materials or Outer Envelopes. *Id.*

35. In accordance with the Contract, Tag was responsible for engaging, managing, and coordinating the Third Party Print Shops' printing the Preprint Materials and Outer

6

Envelopes and delivering the Preprint Materials and Outer Envelopes to the Lettershops for inserting.

36. Under the Contract, Tag was responsible for ensuring that the Third Party Print Shops delivered the Preprint Materials to the Lettershops no later than February 18, 2022. *See* RFP.

### *The Barclays CIT Mailing Grinds to a Halt because of a Lack of Necessary Materials.*

37. In general, lettershops run the jobs for which they have all of the necessary components because the process is mechanized, working essentially as an assembly line. Even before the components can be assembled, significant labor is required to organize and stage the components to ensure efficiency and minimize errors. Meaning, once a lettershop receives components or materials, they cannot "flip a switch" and start the assembly process; rather, the lettershops must organize and stage each of the components to ensure that all of the components have been received and that the project can be assembled in an efficient manner. This process works when all of the components are accounted for and the project can be assembled in full. The process cannot proceed if even one of the components is missing.

38. Initially, each Lettershop was separately responsible for one of the four Gap retail brands to help minimize potential errors.

39. Between December 2021 and March 9, 2022, Quad communicated with Tag regarding the status of the Preprint Materials' delivery to the Lettershops and the related February 18, 2022 deadline. It was necessary—and required by the Contract—for Tag to coordinate timely delivery of the Preprint Materials so that Quad could timely perform its Contract obligations.

40. However, Tag failed to deliver the Preprint Materials to the Lettershops by February 18, 2022.

41.     By February 18, 2022, each of the four Lettershops were missing more than 75% of the Preprint Materials and Outer Envelopes with one Lettershop missing more than 90% of the required materials.

42.     Even by March 29, 2022—two days before the first mail drop date of April 1, 2022—Lettershops were still missing necessary quantities of the materials.  One Lettershop was missing over 325,000 pieces required between two of the Preprint Materials; another Lettershop still had not received nearly 430,000 pieces among three of the Preprint Materials; another Lettershop lacked over 44,000 pieces of one of the Preprint Materials; and yet another Lettershop was missing almost 325,000 pieces between three of the Preprint Materials.  Put another way, no Lettershop had all of the necessary components to make the first mail drop date and none of the components could be re-routed to other Lettershops because the Lettershops and the components were all unique to individual Gap brands.

43.     As of April 1, 2022, the first mail drop date, two Lettershops had 85% of the necessary components, but lacked sufficient Outer Envelopes or Preprint Materials to assemble and mail the Final Materials and two Lettershops only had 65–66% of the Outer Envelopes or Preprint Materials.

44.     Despite these deficiencies, Quad timely delivered the pre-folded Letters to the Lettershops by March 17, 2022 as required by the Contract.

45.     But without each of the Outer Envelopes and/or Print Materials, the Lettershops could not assemble or mail the Final Materials and the production process ground to a halt.

46.     Tag's failures resulted in missing the mail drop dates identified in the Contract because Tag was responsible for coordinating and managing the Third Party Print Shops' printing and delivery of the Preprint Materials to the Lettershops, which did not occur according to the timeline required by the Contract.

47. Quad worked with Tag to triage the Barclays CIT Mailing and get it back on schedule.

48. Despite those efforts, Tag still failed to deliver all of the Preprint Materials to the Lettershops rendering the job incomplete and undeliverable to the Barclay's customers under the requested timeframe.

49. Even though the Barclays CIT Mailing was delayed, Quad continued to assist Tag and incurred additional costs and expense to do so between April 6, and April 25, 2022.

### *Quad's Damages.*

50. Quad issued Tag invoice number 4554128 for $1,593,282.32 ("Invoice"), attached as **Exhibit B**, for Quad's Services.

51. Tag does not dispute $855,407.69 of the Invoice; however, Tag disputes $737,874.63 of the Invoice ("Disputed Amount").

52. The Invoice provides for a one and a half percent (1.50%) service charge on all outstanding balances ("Interest").

53. Tag failed to pay Quad the Disputed Amount owed under the Contract.

54. Despite Tag's failure to deliver or properly manage the delivery of the Preprint Materials to the Lettershops on a timely basis, at Tag's request, Quad attempted to work on a compressed timeline to accommodate the mail drop dates provided in the Contract.

55. As a result, Quad incurred at least $57,850 in additional costs and expenses (the "Overage") to assist Tag in its failure to adequately manage the Barclays CIT Mailing.

### COUNT I:  BREACH OF CONTRACT

56. Quad incorporates by reference each preceding paragraph as though fully set forth herein.

57. Quad and Tag were under contractual obligations to each other, as stated in the Contract.

58. The Contract is a valid and enforceable contract.

59. Quad fully performed the Quad Services under the Contract and is entitled to payment of the Disputed Amount due under the Invoice.

60. Tag failed to pay the Disputed Amount due under the Invoice, as required by the Contract, which constitutes a breach of the Contract.

61. As a result of Tag's breach of the Contract, Quad has suffered damages in the amount of $737,874.63, plus Interest, together with legal fees and costs continuing to accrue, for a total amount to be determined at trial.

## COUNT II: BREACH OF CONTRACT

62. Quad incorporates by reference each preceding paragraph as though fully set forth herein.

63. Quad and Tag were under contractual obligations to each other, as stated in the Contract.

64. The Contract is a valid and enforceable contract.

65. Tag breached the Contract when it failed to adequately manage the Barclays CIT Mailing that resulted in Quad incurring at least an additional $57,850.00 in costs and expenses to mitigate damages to Tag and its customer Barclays.

66. As a result of Tag's breach of the Contract, including without limitation Tag's failure to deliver Preprint Materials to the Lettershops on time, Quad suffered damages in the amount of at least $57,850.00, together with legal fees and costs continuing to accrue, for a total amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Quad prays for judgment as follows:

a. Awarding Quad damages of $737,874.63 plus prejudgment interest of one and a half percent (1.50%), plus at least $57,850.00, as well as interest continuing to accrue thereafter;

b. Awarding Quad reasonable costs and legal fees; and

c. Awarding such other relief as the Court may deem just and proper.


Dated: January 2, 2024
       New York, New York

        **WHITE AND WILLIAMS LLP**

        By:   */s/ Jon T. Powers*
            Jon T. Powers, Esq.
            7 Times Square, Suite 2900
            New York, New York
            Tel: (212) 255-9500
            Fax: (212) 244-6200
            Email: powerst@whiteandwilliams.com

            -and-

        **GODFREY & KAHN, S.C.**

            Erin A. West, Esq. (*Pro Hac Vice* Pending)
            Crystal N. Abbey, Esq. (*Pro Hac Vice* Pending)
            One East Main Street, Suite 500
            Madison, Wisconsin 53703
            Tel: (608) 257-311
            Fax: (608) 257-0609
            Email: ewest@gklaw.com
            Email: cabbey@gklaw.com

            *Counsel to Quad/Graphics, Inc.*